No. 99,411

STATE OF KANSAS, *Appellee,* v. JERRY W. TRUSSELL, *Appellant.*
(213 P.3d 1052)

 Opinion filed August 21, 2009. 

*Michael C. Brown,* of Mulvane, argued the cause and was on the brief for the appellant.

*Jan Satterfield,* county attorney, argued the cause, and *Steve Six,* attorney general, was with her on the brief for the appellee.

The opinion of the court was delivered by

JOHNSON, J.: Jerry W. Trussell appeals his convictions for aiding and abetting first-degree murder and conspiracy to commit first-degree murder. Combined in his first issue, Trussell asserts that the evidence was insufficient to support the verdict and that the district court should have given a self-defense jury instruction. Secondly, Trussell argues that the district court erred in refusing to suppress his statements to law enforcement. Finally, Trussell contends that the district court erred in allowing the State to ask leading questions and in declaring one of the witnesses to be hostile. Finding no reversible error, we affirm.

The principal participants in this unusual scenario were two couples who, in the 1990s, had lived in the south part of Wichita and had formed a friendship. One couple was Franklin Harrod, Jr., also known as "Punkie," who is the victim in this case, and his wife, Kelly Harrod; the other couple was Jerry Wayne Trussell, who is the defendant in this case, and his wife, Tammy Trussell. By 1997, Jerry and Punkie jointly owned a car that they raced at a local speedway.

Kelly Harrod testified that Punkie was an abusive husband and that she had left him in January 1997, taking their two daughters with her to Arkansas. After Punkie filed for divorce in Sedgwick County, obtaining an order awarding temporary custody of the children to him, Kelly returned to the South Wichita home. Shortly

thereafter, Kelly discovered that she was pregnant, and Punkie dismissed the divorce action.

However, Kelly began confiding in Tammy about her situation, ultimately expressing a desire to have Punkie out of her life and a fear that Punkie would kill her if she left him again. Kelly said that she could not get rid of Punkie, because she would be the first one suspected of foul play. She suggested that Tammy could do it for her. Tammy subsequently told Jerry about Kelly's conversations.

The conversations between Kelly and Tammy initially took the form of vague fantasizing about life without their husbands. However, Jerry began to discuss the endeavor in earnest and struck a deal with Kelly to "take care of it" in return for her having sex with him. Kelly, Tammy, and Jerry began having weekly conversations about "doing away" with Punkie. In the spring or early summer of 1997, Jerry and Tammy asked a neighbor, Jerry Wilson, for a gun. Wilson testified that Jerry said he wanted the gun "because he was going to kill someone or get rid of that Punkie guy or do something to him."

In late June or early July 1997, the Trussells were evicted from their home and moved in with Punkie and Kelly. Kelly continued to have sex with Jerry as payment for arranging for Punkie's demise. By late July, Kelly told both Tammy and Jerry that she wanted to get things "over with." Tammy testified that, the night before Punkie was killed, she and Jerry had a conversation during which he informed her that he could not find anyone willing to take care of Punkie. Realizing that they "would have to do this [them]selves," the couple devised a plan for Tammy to shoot Punkie while Jerry distracted him or held him down. Kelly was not a participant in that conversation.

The next morning, Jerry instructed Kelly to remain in the house. While she was getting the children ready for school, Jerry and Punkie began fighting outside. As the fight escalated, Tammy ran outside, yelling at the combatants to stop. Jerry yelled for her to get the gun, and Tammy retrieved the weapon from a nearby truck. After returning, Tammy heard Punkie say that he would kill everyone when he got off the ground. Jerry repeatedly told Tammy to

"do it" or "shoot it." Tammy complied, shooting Punkie in the head.

The next day, Tammy and Jerry took Punkie's body, wrapped in a blue roofing tarp, to a remote location and buried it in a shallow grave. Kelly made a missing person report to the police.

In August 1997, Wilson anonymously reported the Trussells' attempt to obtain a gun from him. Tracy Wells, the former wife of Shawn Martinez, used a pseudonym to report that Jerry had tried to enlist Shawn's help with disposing of Punkie's body. Nevertheless, the case remained under investigation for years, with Jerry, Tammy, and Kelly holding to their original story that Punkie had just disappeared.

However, in 2001, Tammy began offering the police many different versions of what happened, implicating both Jerry and Kelly in Punkie's death. Ultimately, in May 2004, Tammy confessed her role in the murder, in exchange for a plea to voluntary manslaughter and her testimony against Jerry. Tammy showed police the location of Punkie's grave, albeit the body was never recovered. Police did find a blue tarp in the vicinity of the gravesite. Kelly bargained for a plea to solicitation of first-degree murder, conditioned on her testimony against Jerry, for which she received derivative use immunity.

Jerry was finally charged with Punkie's murder on July 7, 2005. After amendments, the information charged him with aiding and abetting murder in the first degree and conspiracy to commit first-degree murder. The trial commenced on October 10, 2006. During that trial, the district court suppressed a November 19, 2001, statement that Jerry made to a Detective Hopper, finding that it was the product of a custodial interrogation without the benefit of *Miranda* warnings. The jury could not reach a unanimous verdict, and the court declared a mistrial.

A new trial began June 18, 2007. The State filed a motion to reconsider the court's suppression of Jerry's statement to Detective Hopper. The court granted that motion and ruled that the statement could be admitted. The jury convicted Jerry on both counts. His motions for mistrial, new trial, and directed verdict of acquittal were denied. The court sentenced Jerry to a hard 25 life sentence

on the murder charge and a consecutive 146-month prison term on the conspiracy count. Jerry timely appealed, and we have jurisdiction pursuant to K.S.A. 22-3601(b)(1).

## SUFFICIENCY OF THE EVIDENCE

Where Jerry has combined more than one legal question under a single issue, we take the liberty of considering each issue separately. First, Jerry argues that the evidence was insufficient to convict him of aiding and abetting first-degree murder. Our standard of review is well settled; we view the evidence in a light most favorable to the prosecution to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *State v. Vasquez*, 287 Kan. 40, 59, 194 P.3d 563 (2008); *State v. Saleem*, 267 Kan. 100, 104, 977 P.2d 921 (1999). We do not weigh the evidence or reassess witness credibility. See *Ives v. McGannon*, 37 Kan. App. 2d 108, 124-25, 149 P.3d 880 (2007).

Jerry's principal argument is that the State failed to meet its burden of proving premeditation beyond a reasonable doubt. Even though the State proceeded on an aiding and abetting theory, it was required to prove that Jerry possessed the specific intent of premeditation in order to convict him of first-degree murder. See *State v. Overstreet*, 288 Kan. 1, 11, 200 P.3d 427 (2009); *State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 (2005).

Jerry contends that the testimony about his participation in the planning of the murder was conflicting and it failed to establish that he had made a specific commitment to do a specific act in furtherance of the plan. Further, he suggests that Tammy's testimony about the specific plan hatched the night before the murder was not believable, because it was a virtually unworkable plan. Although Jerry's characterization of the evidence is suspect, we need not quibble about that. His arguments are simply an invitation to reweigh the evidence and to reassess the credibility of the witnesses. We decline the invitation to go outside our function as an appellate court.

Moreover, to prove the premeditation element of the first-degree murder charge, the State was not required to prove that Jerry planned the murder the night before. That proof was required for

the conspiracy charge, but premeditation does not require such advance planning. Jerry acknowledged this difference by citing to the pattern instruction defining premeditation:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantáneous, intentional act of taking another's life." PIK Crim. 3d 56.04(b).

Nevertheless, the State put on evidence which, viewed in the light most favorable to the prosecution, established that Jerry participated in developing a plan to kill Punkie. One would be hard-pressed to find a more definitive example of a murderer having "thought the matter over beforehand." Further, Tammy testified that Jerry repeatedly yelled at her to "do it" or "shoot it," prior to the killing, further evidencing a premeditation. In short, the evidence of premeditation in this case was more than sufficient to support the first-degree murder conviction.

## JURY INSTRUCTION

Jerry contends that evidence existed to warrant an instruction on the use of force in defense of another person or in self-defense. He argues that the evidence established that Jerry was no match for Punkie in a hand-to-hand fight, that Jerry was losing the fight with Punkie, and that Punkie had yelled that he was going to "kill everybody."

Jerry acknowledges that he did not request such an instruction or object to its omission, triggering a clearly erroneous standard of review. See K.S.A. 22-3414(3) (party may not assign as error the failure to give an instruction unless the party objects thereto, stating distinctly the matter to which the party objects and the grounds of the objection unless the failure to give an instruction is clearly erroneous); see also *State v. Sappington*, 285 Kan. 158, 163, 169 P.3d 1096 (2007) (when the defendant does not request or object at trial to the omission of a jury instruction, appellate court applies a clearly erroneous standard of review). Under that standard, the reviewing court must find that there was a real possibility the jury

would have rendered a different verdict if the instruction had been given. 285 Kan. at 163.

Citing to *State v. Sims*, 265 Kan. 166, Syl. ¶ 3, 960 P.2d 1271 (1998), Jerry summarily argues that a court shall give a jury instruction on self-defense if there is any evidence to support that theory of defense. That case, however, does not provide authority for Jerry's position. There, Sims had requested the instruction, so that the clearly erroneous standard was not applicable. Further, that opinion actually found that

" 'a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed . . . in the light most favorable to the party requesting the instruction.' " 268 Kan. at 168 (quoting *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 [1992]).

Here, Jerry does not contend that his trial strategy was to defend on the basis of self-defense or defense of others. In opening statement, defense counsel indicated that the defense theory was that Jerry was a "fall guy" for the murder plan's architects, Kelly and Tammy. Contending that Punkie had to be killed to protect Jerry and/or Tammy from Punkie's attack is inconsistent with the "fall guy" theory. We have previously noted that, while inconsistent theories of defense are permissible, trial courts should not interfere with a defendant's chosen defense theory by giving an instruction which neither party requested and which may undermine defendant's chosen theory. *Sappington*, 285 Kan. at 164-65. Moreover, trial courts are not required to provide instructions for every possible theory of defense just because some supporting evidence may be produced at trial, if the defendant has not relied on the particular defense theory. 285 Kan. at 165.

In conclusion, we find that, under the circumstances of this trial, the trial court was not obligated to give a self-defense or defense of others instruction in the absence of a request for such an instruction.

## FAILURE TO SUPPRESS DEFENDANT'S STATEMENT

Jerry contends that the district court erred in reversing itself at the second trial and allowing the admission of his unwarned state-

ment to Detective Hopper. Our review is constricted to some degree because the transcript from the first trial is not in the record on appeal, even though the parties have cited to the record volumes as if the record contained the original trial transcript. Accordingly, we do not have the court's factual findings and legal conclusions for its original ruling suppressing the statement. The court's ruling at the second trial indicates that its sole focus at that point was determining whether the encounter was a custodial interrogation so as to require the officer to give the *Miranda* warnings. See *State v. Morton*, 286 Kan. 632, 647, 186 P.3d 785 (2008) (*Miranda* warnings required only where there has been such a restriction on a person's freedom as to render him or her " 'in custody' "). Specifically, the district court stated:

"[T]he Court believes that its initial ruling in this matter at the first trial was in error and that the motion to reconsider should be granted and that the statement given by the defendant at the station will be admissible at this trial. I tend to agree with the State that we focused previously too much on whether or not *Miranda* was given or not and I think the Court got into a feeling that custodial interrogation was assumed then.

"And after reexamining the facts surrounding that interview, the Court finds that *it was not a custodial interrogation.*" (Emphasis added.)

In his brief on appeal, Jerry makes an alternative argument that, notwithstanding the *Miranda* issue, his statement was not voluntary. That argument was not developed at the trial level, and the district court did not make the requisite factual findings to allow a review of that issue. Accordingly, we will confine our review to the second trial finding that Jerry was not subjected to a custodial interrogation. See *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007) (issues not raised before trial court cannot be raised on appeal).

The determination of whether an interrogation is custodial involves a two-prong test. Under the first prong, the court determines the circumstances surrounding the interrogation, employing a substantial competent evidence standard. The second prong employs a de novo standard to determine whether, under the totality of those circumstances, a reasonable person would have felt free

to terminate the interrogation and disengage from the encounter. *Morton*, 286 Kan. at 640.

At the second trial, the State argued that the interview was conducted under the following circumstances: Detective Hopper met Trussell at work indicating that he wanted to talk; Detective Hopper suggested that they go to a nearby substation of another law enforcement agency, so that they could have some privacy without interruption by customers; Trussell agreed to go; Trussell drove himself to the substation in a separate vehicle; Tammy rode with Trussell to the substation; the interview was conducted in the lobby of the substation; the interview took approximately 30 minutes; Trussell was never placed under arrest; Detective Hopper told Trussell he was free to leave at any time; Trussell was told that he was not required to speak to Detective Hopper; and Trussell eventually left on his own free will. In finding that the defendant was not in a custodial interrogation, the district court recited three of those facts: (1) the interview occurred in a lobby; (2) the defendant drove to the substation "independently"; and (3) the defendant was advised at least twice that he was free to go at any time he wanted.

The parties' mistaken belief that the first trial transcript is in the appeal record hampers our analysis of the first prong, *i.e.*, whether substantial competent evidence supports the factual findings as to the circumstances of the interview. Some of the circumstances surrounding the interview were apparently related in Detective Hopper's testimony at the first trial, but not repeated at the second trial. However, Jerry has not contested the State's recitation of those interview circumstances, has himself cited to the missing first trial transcript of the detective's testimony, and has not challenged the evidentiary support of the facts upon which the district court relied. See *State v. Paul*, 285 Kan. 658, 670, 175 P.3d 840 (2008) (appellant's duty to designate record on appeal). Accordingly, we will accept the State's recitation. See *State v. Haney*, 34 Kan. App. 2d 232, 236, 116 P.3d 747, *rev. denied* 280 Kan. 987 (2005) (where record inadequate, appellate court presumes district court's findings are properly supported).

Moving to the second prong, many of the circumstances surrounding Jerry's interview are comparable to other instances in

which we have determined that the interviewee was not in custody. See, *e.g.*, *Morton*, 286 Kan. at 646-47 (interview noncustodial where defendant voluntarily drove herself to the police station, interview did not take place in a regular interview room, she was told she was not under arrest and could refuse to answer questions, she was told she could leave at any time, and she was not physically restrained in any way); *State v. Jones*, 283 Kan. 186, 196-97, 200-01, 151 P.3d 22 (2007) (interview noncustodial where, although defendant was under subpoena and was arrested after the interview, he came to the interview voluntarily, officers told him he was not in custody and that the interview was voluntary, he was not restrained or threatened, and he was initially questioned as a witness); *State v. Heath*, 264 Kan. 557, 591, 957 P.2d 449 (1998) (interview was not custodial where defendant went to the police station voluntarily to be interviewed and waited unrestrained in waiting room prior to interview); *State v. Ninci*, 262 Kan. 21, 32-33, 936 P.2d 1364 (1997) (defendant who voluntarily agreed to appear at a police station for questioning was not subjected to "custodial interrogation," despite the fact that he was asked questions that the police knew were reasonably likely to elicit an incriminatory response); *State v. Loosli*, 130 Idaho 398, 399-400, 941 P.2d 1299 (1997) (interrogation not custodial where the defendant agreed to come to the police station to answer questions, the officers informed the defendant he was free to leave, and the defendant was allowed to leave after the questioning).

Here, although the interview occurred in a law enforcement facility, it was not the station of the interviewing detective. The detective suggested moving the interview to that site for convenience, *i.e.*, to avoid interruption by customers at Jerry's workplace, and Jerry agreed to the move. Jerry drove himself to the location, accompanied by Tammy. The interview was conducted in the lobby of the facility, rather than an isolated interview room. Jerry was told he was free to leave whenever he wanted. Further, Jerry points out in his brief that the detective "told [him] numerous times that no matter what he said he would not be arrested." The totality of the circumstances would indicate to a reasonable person that he or she was free to terminate the conversation and leave at any time.

Accordingly, we affirm the district court's determination that Jerry was not in custody and the failure to give him the *Miranda* warnings did not mandate the suppression of his statements.

## LEADING QUESTIONS

Next, Jerry asserts that the district court erred in permitting the State to ask leading questions in direct examination and in declaring one witness to be a hostile witness. We first consider the complaint that the prosecutor used leading questions in the direct examination of the State's witnesses, other than the hostile witness.

Jerry recites that the decision to permit leading questions rests within the discretion of the trial court, so that our standard of review is abuse of discretion. See *State v. Jones*, 204 Kan. 719, 727, 466 P.2d 283 (1970). The disconnect in Jerry's argument is that the trial court did not *permit* the prosecution to use leading questions. Each time the defense objected to the prosecutor's use of a leading question, the trial court sustained the objection, unless the prosecutor offered to rephrase or withdraw the question. The district court committed no error in that regard.

However, Jerry also contends that the prosecutor asked many leading questions to which the defense did not object, many of which involved information critical to the State's case. The record confirms this allegation. Nevertheless, those errors were not preserved for review. See K.S.A. 60-404 (no reversal for erroneous admission of evidence unless contemporaneous objection appears of record); see also *State v. Williams*, 228 Kan. 723, 731, 621 P.2d 423 (1980) (holding that defendant's assertion that the use of leading questions violated the rules of evidence to such an extent that defendant was denied his right to a fair trial was not preserved for appeal without contemporaneous objections).

We can appreciate Jerry's argument that the State's repeated use of leading questions creates a dilemma for defense counsel, *i.e.*, whether to constantly object to preserve the issue for appeal and thereby risk having the jury misconstrue the numerous objections as an attempt to hide information. Likewise, we agree with his observation that even where an objection to a leading question has been sustained, the prosecutor has effectively communicated

to the witness the answer the prosecutor would like to hear. Unfortunately, the record in this case poignantly illustrates those points. At one point in the trial, the following exchange occurred:

"Q: (By Ms. Satterfield) She didn't say to you, I was having sex so he would help get rid of Punkie?
"A: No.
 "MR. BROWN: Am I going to get to cross-examine the prosecutor sometime during this trial? She seems to be testifying, Judge?
 "THE COURT: I'll let you.
 "MR. BROWN: Thank you.
 "THE COURT: Counsel.
 "MS. SATTERFIELD: All right. You are not really going to let him do that, are you?
 "THE COURT: No, but let's—
 "MS. SATTERFIELD: I'll mind my Ps and Qs, Your Honor. Sorry.
 "THE COURT: Please."

Thereafter, the prosecutor continued to employ leading questions. In fact, the very next question was: "She told you she had an affair with him?" However, the defense refrained from objecting to that question and only sporadically objected thereafter.

Interestingly, the State responds to this issue by referring us to the two-step analysis employed where an appellant has made allegations of prosecutorial misconduct. Perhaps prosecutorial misconduct could be an avenue to seek redress for a prosecutor who was unwilling or incapable of refraining from asking leading questions and suggesting answers on direct examination of State witnesses, after being admonished to do so by the trial court. However, Jerry did not raise an issue of prosecutorial misconduct and as the issue is presented to us, it must fail.

## HOSTILE WITNESS

Finally, Jerry argues that the trial court erred in not sustaining his objection to the trial court's declaring Tracy Wells to be a hostile witness, which allowed the State to utilize leading questions. He relies on *State v. Young*, 277 Kan. 588, 601, 87 P.3d 308 (2004), where this court recited:

"The determination of whether a witness is hostile is entrusted to the discretion of the district court. It should be based upon the demeanor of the witness, the

witness' situation and relationship to and with the parties, the witness' interest in the case, and the inducements he or she may have for withholding the truth.' *State v. Manning*, 270 Kan. 674, 681-82, 19 P.3d 84 (2001). Once a witness is declared hostile, the witness may on direct examination be subjected to leading questions, . . . and be examined regarding prior inconsistent statements."

The *Young* court also noted that "a witness who does not recall making the earlier statement or statements or who simply refuses to testify" may be declared a hostile witness. 277 Kan. at 601.

Jerry argues that Wells did not testify contrary to her previous statements and was not testifying adverse to the State. The record belies that assertion. Detective Hopper related Wells' statements from his January 2003 interview, which included a statement that her husband had told her that Punkie had died while fighting with Jerry and that Tammy had shot Punkie. Some of Wells' answers at trial contradicted her statements to Hopper, and in some instances, Wells professed to being unable to remember what others, including her husband, had told her. Moreover, even from the cold record, it is clear that Wells' responses to the prosecutor's questioning, many of which were one-word answers, manifested hostility.

In addition, Jerry contends that the proper foundation was not laid to permit the trial court to find Wells to be a hostile witness. The first time the question arose was in connection with a hearsay objection by the defense. The exchange was as follows:

"MR. BROWN: Judge, objection. Is the Court going to declare her an uncooperative witness?

"MS. SATTERFIELD: She's not being uncooperative. She's just answering the questions, what she did, how she did it, when she did it.

"THE COURT: Okay. All right. The questions are leading. I'll sustain that motion. I don't find that she is as of yet a hostile witness so. You can't lead. If you feel a bit later that she is, why you can certainly ask me again about that."

After further attempts by the prosecutor to elicit testimony from Wells, the following exchange occurred:

"Q. Do you recall being interviewed by Glenn Hopper in 2003, January?

"A. A little bit, yes.

"Q. Okay. And did you tell him that Punkie had been killed?

"A. I don't remember what I told him.

"THE COURT: Ms. Satterfield, I'm going to declare her a hostile witness at this point?

"THE WITNESS: What does that mean?

"THE COURT: Apparently you have contrary information about what she has testified to at early times than what she is now.

"MS. SATTERFIELD: Yes.

"MR. BROWN: Judge, can we have determination made on the record, please, out of the presence of the jury?

"THE COURT: No.

"MR. BROWN: All right.

"THE COURT: So you have the Court's permission to lead.

"MS. SATTERFIELD: Thank you.

"MR. BROWN: Please note my objection. I don't think we followed the proper procedure for the declaration of a hostile witness.

"THE COURT: All right."

By the time the court made its determination to declare Wells a hostile witness, it had been afforded an opportunity to observe the witness' demeanor, to hear her declare that she did not remember on multiple occasions, and to observe the prosecutor's attempts to refresh the witness' recollection or impeach her testimony with her prior statements. The court had sufficient foundation upon which to make its ruling, and it did not abuse its discretion in declaring Wells to be hostile to the State.

Affirmed.