NOT DESIGNATED FOR PUBLICATION

No. 114,962

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARC ANWAR WILLIAMS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed June 30, 2017. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree, Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., HILL, J., and HEBERT, S.J.

*Per Curiam*:  In this appeal of convictions for several sex crimes with a minor, we hold that the prosecutor's comments about the fear of the victim were not prejudicial because they were made in response to Marc Anwar Williams' final argument. Also, the trial court's exercise of discretion in permitting a leading question of the victim and limiting the defense counsel's questioning of the jury panel were proper. Finally, we find no reason the court should have granted Williams a new trial. We affirm Williams' convictions.

1

*Over the years, what began as touching turned to intercourse.*

As a young girl, S.G. frequently visited and stayed with her grandmother. Williams, S.G.'s father, also lived there. One day, when S.G. was 14, her grandmother discovered a 16-year-old boy alone with S.G. in her bedroom. Grandmother told S.G.'s mother of the incident. Taking steps to address the situation, S.G.'s mother intended to take her to the doctor to see if S.G. had been sexually active. While denying any sexual activity with the boy, S.G. feared that the doctor might find evidence of other sexual activity.

At this point, S.G. disclosed to her mother that Williams had been molesting her since she was about 8 years old. S.G. was shaky and could not speak the words to her mother so she wrote them on a napkin. S.G.'s mother took her to the police department that day to report the abuse.

Officer Carl Rowland took an initial report to get the basic information without asking any specific questions. S.G. told Officer Rowland that Williams began to fondle and sexually abuse her when she was 8 or 9 years old. S.G. did not know specific dates, but she stated she was 14 years old the last time Williams raped her. S.G. was able to identify two instances of sexual intercourse.

Later that month, Erin Miller Weiss, a forensic interview specialist at Sunflower House, interviewed S.G. Initially, when asked what happened, S.G. sat silently. She eventually asked if she could write down her answer. S.G. wrote down, "my biological dad has been molesting me since I was 8." Highly summarized, S.G. clarified that Williams had been touching her private part "that goes pee" with his hand since she was 8 years old. After the first time Williams touched her private part, S.G. told Williams that she was going to tell her mom. Williams held a kitchen knife to her and threatened that he would kill her and everyone she cared about if she told anyone.

Then, when S.G. was around 13, he began penetrating her. In her words, Williams penetrated both her "private part that goes pee and her private part that goes poop with his private part that goes pee."

The State charged Williams with aggravated indecent liberties with a child, an off-grid person felony, for touching S.G.'s vagina when she was under the age of 14; aggravated criminal sodomy, an off-grid person felony, for anal copulation with S.G. when she was under the age of 14; and aggravated indecent liberties with a child, a severity level 3 person felony, for sexual intercourse with S.G. when she was 14 years old.

*The jury found Williams guilty on all counts.*

At trial, S.G.'s mother, Officer Rowland, and Weiss testified and recounted the facts as stated above. Also, a video recording of Weiss' interview with S.G. was played for the jury.

Then, Dr. Tanya Burrell, a child abuse and neglect pediatrician at Children's Mercy Hospital who had examined S.G., testified. She said that during the examination she was looking for anything abnormal. She did not see any bruising or tissue tears. She found "basically . . . a normal adolescent female."

When asked, she gave reasons why an examination may be normal despite allegations of penetration. S.G.'s last sexual contact was in 2013 and the physical examination took place in February 2014. The doctor talked about the healing process after sexual assaults involving penetration. The doctor concluded that S.G.'s normal exam would not be inconsistent with her previous disclosure of penetration.

3

Following up on this point, the State asked if it was uncommon for the result of an examination to be normal when there was an allegation of penetration. Based on the doctor's training and experience, Dr. Burrell testified that it was not uncommon. She said most patients do have a normal exam. She testified that tissue is stretchy and tissue heals. After all, she had examined S.G. months after the last allegation of abuse.

During cross-examination, the doctor stated that she observed no tears or scars that would indicate abuse. She saw no split in the rim of the hymen, and S.G.'s hymen was normal.

S.G. also testified. Throughout the questioning by the State, S.G. did not quickly respond when asked to talk about the abuse. The State repeatedly asked S.G. what happened and S.G. gave no response. The State then asked more background questions, again asked S.G. to describe what happened, and S.G. would not respond. The record reflects there were ten instances where S.G. did not respond before she finally stated, "He touched me." S.G. eventually described how Williams touched her front private part with his hand and penetrated her front and back private parts with his front private part. She also told the jury about his threats with a knife.

Williams presented no evidence. The jury found him guilty on all counts. The court sentenced Williams to a controlling life sentence with no possibility of parole for 25 years.

*The prosecutor's comments were not out of bounds.*

For his first contention, Williams argues that the prosecutor, in her concluding remarks, improperly commented on S.G.'s credibility and improperly appealed to the sympathies of the jury. Our review of the record leads us to conclude that the prosecutor's comments regarding S.G. being fearful of testifying were fair in this case because they

were in direct response to defense counsel's suggestion that S.G.'s fear of Williams had vanished. In other words, the comments were within the wide latitude the law affords prosecutors.

All trial arguments should be considered in context and not in isolation. Williams' counsel, in summation, impugned S.G.'s credibility. Essentially, counsel argued that even though S.G. had testified that she was fearful of Williams because he had threatened her, she could not have actually been fearful because she did not disclose the abuse until after her grandmother had caught her with a 16-year-old boy in her bedroom. This remark prompted a response from the prosecutor.

The prosecutor asked the jury to consider S.G.'s demeanor:

"Now, the defense says that as soon as her grandma caught her with that boy that all the fear went away. Well, ladies and gentlemen, you're allowed to—your job as a juror is to determine credibility.

. . . .

". . . And one of the things that you can consider is demeanor. And you saw [S.G.] when she testified. Use your common sense. Did it appear that all the fear had vanished? Obviously she was traumatized, obviously she was having a very difficult time. And why? Because she was having to testify in front of the defendant, the same defendant that since she was eight years old after he touched her, he told her what would happen if she told. Well, [S.G.] did finally tell, but she's having to face him and having— use your common sense, is it possible that she had difficulty talking about it because she was having to face him and was worried about the fact that she did finally tell and worried about what could possibly happen to her and her family?

The defense made no objection to these comments. But Williams did seek a new trial claiming prosecutorial error on these grounds.

In its denial of the motion for a new trial, the trial court held that this was not a direct comment of the prosecutor's personal belief on S.G.'s credibility, but a reminder of the various factors the jury is allowed to consider when deciding about the credibility of a witness. The trial court ruled the comments were not improper.

Our Supreme Court has recently revised our procedures in considering such questions. In *State v. Sherman*, 305 Kan. 88, 90-91, 378 P.3d 1060 (2016), the court replaced the term "prosecutorial misconduct" with the term "prosecutorial error." Appellate courts now examine such claims sequentially in two steps:

> "Under the first step, we will continue to analyze whether the prosecutor's statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' [*Sherman*,] 305 Kan. 88, Syl. ¶ 7. At the second stage of the analysis . . . the prejudice analysis will focus on whether the error prejudiced the defendant's due process rights to a fair trial; if a due process violation occurs, prejudice will be assessed by applying the *Chapman* constitutional error standard. [*Sherman*,]305 Kan. 88, Syl. ¶ 8. Under that standard, '[p]rosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Kleypas*, 305 Kan. 224, 316, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017).

In other words, when tackling this issue, an appellate court must answer a series of questions: Is the comment outside the wide latitude granted to prosecutors? If so, has the defendant been denied due process by the comment? If there is a denial of due process, is there no reasonable possibility that the error contributed to the verdict? Our inquiry here need not go past the first question.

The law gives prosecutors a wide latitude to tell the jury what to look for to assess witness credibility and to ask the jury to draw reasonable inferences from the evidence.

6

*State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011); *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 (2009). Just how wide that latitude is was illustrated in the holding found in *State v. Murray*, 285 Kan. 503, 517-18, 174 P.3d 407 (2008). A witness testified that she thought the defendant might be involved. The prosecutor, in closing argument, paraphrased the statement to, "His best friend thinks he's a murderer." 285 Kan. at 515. Because the defendant chose to first introduce the witness' statement regarding the defendant's guilt, the Supreme Court held that the prosecutor in his summation for the jury could argue about inferences that could be drawn from that statement. 285 Kan. at 517-518. In other words, the Supreme Court ruled the paraphrase was within the wide latitude of comments afforded to prosecutors. We turn to a brief review of the law on this point.

Credibility is the quality that makes something or someone worthy of belief. In assessing credibility, a jury is permitted to consider a witness' demeanor. During closing argument, then, the prosecutor may remind the jury of the witness' demeanor. *State v. Todd*, 299 Kan. 263, 285-86, 323 P.3d 829 (2014).

The cases illustrate the latitude prosecutors have in this regard. It is not error for a prosecutor to encourage the jury to conclude from a witness' demeanor that the witness was truthful. *State v. Knox*, 301 Kan. 671, 686, 347 P.3d 656 (2015). It is not error for a prosecutor to ask rhetorical questions that probe whether there was any motivation for a witness to lie. *State v. Ortega*, 300 Kan. 761, 777, 335 P.3d 93 (2014). Even so, the prosecutor's comments must be viewed in context, not in isolation. *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010). The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered on appeal when determining whether prejudicial error has occurred when questionable comments by a prosecutor are provoked and made in response to arguments by defense counsel. See *State v. Marshall*, 294 Kan. 850, 858-61, 281 P.3d 1112 (2012).

Two cases are pertinent to our inquiry. In *State v. Scaife*, 286 Kan. 614, 623, 186 P.3d 755 (2008), a murder case, Scaife argued that the prosecutor committed misconduct by vouching for a witness' credibility.

In closing argument, the prosecutor commented on an audiotape recording of the witness' 911 call by stating: "'Listen to his voice, listen to his pleading, listen to the manner in which he asked for help. That's how you know that he's telling the truth.'" 286 Kan. at 623. Defense counsel then argued the witness was not credible. In rebuttal, the prosecutor responded: "'Now, why believe Patrick Ross? Folks, you saw him, you've heard him from the very beginning of this case which was seconds after it began. Evaluate his testimony, evaluate his demeanor, evaluate what he told you, and you don't have any other conclusion.'" 286 Kan. at 623.

The Supreme Court held that the prosecutor's comments were permissible. The prosecutor answered the defense attack of the witness' credibility by explaining the legitimate factors the jury should evaluate to determine credibility. Demeanor of the witness is one such factor. The prosecutor argued why the factors supported an inference that the witness was truthful. The comments were fair argument on the evidence and did not constitute misconduct. 286 Kan. at 624-25.

More recently, in *State v. Glasgow*, No. 113,155, 2016 WL 4582542, at *6-7 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* September 30, 2016—a child rape case—the prosecutor, in closing arguments, several times referred to the "trauma" the victim experienced when having to tell her story. The prosecutor said:

> "You watched [the victim] testify, you can tell that she is still traumatized by the events. You could see the trauma on the DVD. . . .
>
> . . . .

8

"Why should you believe her? First of all, why would she lie? What reason would she have to come here and perjure herself? . . . . Why would anyone put themselves through this trauma? Why would anyone go through what she went through yesterday if it wasn't the truth?" 2016 WL 4582542, at *6.

The panel held that the statements did not constitute prosecutorial misconduct. 2016 WL 4582542, at *8-10. That is factually similar to this case.

When we consider the guidance offered by these two cases, resolution of this issue becomes clear. Here, the prosecutor, in response to the defense attacks on S.G.'s credibility, discussed factors the jury could consider to assess credibility by asking rhetorical questions. These are not inflammatory comments. Obviously, the jury observed S.G.'s demeanor in the courtroom and viewed her recorded interview. It was quite apparent S.G. exhibited great difficulty in discussing the sexual abuse. Thus, there was a factual foundation for the prosecutor's comments regarding S.G.'s demeanor and lack of motive to lie.

Like the trial court, we are not persuaded that the prosecutor was offering a personal opinion about or vouching for the truthfulness of S.G. Instead, she was rhetorically attempting to persuade the jury that S.G. continued to be afraid of Williams. We hold the prosecutor's comments were within the wide latitude given to prosecutors. See 2016 WL 4582542, at *10.

*We find no error in the trial court permitting leading questions.*

Williams argues that denying his objection to the State asking leading questions is reversible error. Kansas courts have previously permitted leading questions during direct examination in order to assist a witness when the witness is unable to easily answer the

questions. We hold that this is such an instance and is not reversible error. The leading questions came up when S.G. was asked about hair grease.

During her recorded interview, S.G. told Weiss that she remembered Williams putting hair grease or Vaseline on her private parts to make the penetration easier.

During direct examination, the State asked S.G. about an instance of anal penetration she remembered. As part of the line of questioning, the State asked, "Now, before he penetrated your private part with his private part, did he do anything? Did he put anything on you or on himself?" S.G. responded, "No." In short order, the State asked S.G. about an instance of vaginal penetration she remembered. The State asked, "Now, before he penetrated your private part, did he put anything on his body?" S.G. responded, "No." The State asked, "What about did he put anything on your body?" S.G. responded, "No." A short time later, the prosecutor returned to the subject of substance placed on the body for lubrication:

> "Q.      Was—I know . . . I asked you about specific times, . . . was there anytime that Marc put anything on your body?
>
> >"MR. LAMB:  Objection; asked and answered twice.
> >"THE COURT:  Overruled.
>
> "Q.      (By Ms. Hill) Was there anytime that Marc put anything on your body?
> "A.      I don't understand your question.
> "Q.      Okay. Did he—other than touching you with his [*sic*] or touching you with his hands, did he ever put any substance on your body?
>
> >"MR. LAMB:  Objection; leading.
> >"THE COURT:  Overruled.
>
> "A.      No.
> "Q.      (By Ms. Hill) Do you remember did you ever tell anybody about any hair grease or—
> "MR. LAMB: Objection; leading.
> "THE COURT: I'll allow it.

"Q.     (By Ms. Hill) Did you ever tell anybody about any hair grease or any—

"A.     At one point this happened and I was braiding his hair and there was grease in the room and he put grease on me because he couldn't penetrate me and the grease made it easier for him.

"Q.     Okay. Made it easier for him to what?

"A.     Penetrate me.

"Q.     What part of your body?

"A.     Back private part.

"Q.     Okay. Do you remember that happening—

"A.     Yes.

"Q.     —or is it just—

"A.     I just like I had —'cause everything kind of like with this blurs together so sometimes it's kind of hard to separate different instances.

"Q.     Do you remember telling someone else about that happening as well?

"A.     Yes."

Clearly, the prosecutor mentioned hair grease in her questioning.

It is well settled that the decision to allow leading questions on direct examination rests within the discretion of the trial court. *State v. Trussell*, 289 Kan. 499, 509, 213 P.3d 1052 (2009). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the viewed adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016).

Kansas courts have permitted leading questions on direct examination to assist a witness when the witness is unable to easily answer the question posed. *State v. Jones*, 204 Kan. 719, 727-28, 466 P.2d 283 (1970); *State v. Humphrey*, 30 Kan. App. 2d 16, 20-21, 36 P.3d 844 (2001). In *Humphrey*, a rape victim had difficulty answering questions

11

during the State's direct examination. The victim suffered from mental deficiencies. During questioning, the victim paused before answering numerous questions. The victim's hesitation to answer questions increased when asked about the details of the crime.

The trial court in *Humphrey* authorized the State to ask the victim leading questions. The trial court was frustrated with the sluggishness of the proceedings. Defense counsel was given the opportunity to fully cross-examine the victim. This court held there was no abuse of discretion in the trial court's decision to permit leading questions. 30 Kan. App. 2d at 21.

Clearly, the record here reflects that S.G. had a difficult time answering questions about the specifics of the abuse. The State asked S.G. several times to explain what happened with no response. The record reflects there were ten instances where S.G. did not respond before she stated, "He touched me." Before the prosecutor asked S.G. the leading question at issue, S.G. stated that she did not understand the prosecutor's question.

Under these circumstances, we find it was reasonable to permit the leading questions. S.G. explained that the instances of abuse blurred together and that is why she did not remember the hair grease when asked about specific instances. The defense was given the opportunity to fully cross-examine S.G. about the allegation. We find no abuse of discretion.

*Dr. Burrell's expert opinions were admissible.*

Williams argues that when Dr. Burrell testified that a normal physical examination result was not inconsistent with S.G.'s allegation of penetration, she was no longer speaking as an expert witness but instead had invaded the province of the jury. He

12

contends that the court should have sustained his objection and, failing that, then later should have granted his motion for a new trial on this ground. To the contrary, we find no abuse of discretion here.

The statute, K.S.A. 2016 Supp. 60-456, governs the admission of expert testimony. Generally, experts with scientific, technical, or other specialized knowledge can offer opinions that may help the trier of fact to understand the evidence or to determine a fact in issue. Subsection (d) of the statute notes that opinion testimony otherwise admissible under the statute "is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

Prior courts have ruled that expert opinion testimony is generally admissible if it aids the jury with unfamiliar subjects or interpreting technical facts or if it assists the jury in arriving at a reasonable factual conclusion from the evidence. *State v. Gaona*, 293 Kan. 930, 948, 270 P.3d 1165 (2012). Expert testimony is unnecessary if the normal experience and qualifications of jurors allows them to draw proper conclusions from the provided facts and circumstances. *State v. Wells*, 289 Kan. 1219, 1236, 221 P.3d 561 (2009).

It is important to review the testimony at this point. The State asked Dr. Burrell if, based on her training and experience, it was uncommon for the result of an examination to be normal when there was an allegation of penetration. Dr. Burrell testified that it was not uncommon. She said most patients do have a normal exam. She testified that tissue is stretchy and tissue heals. She examined S.G. months after the last allegation of abuse.

Dr. Burrell then began to draw a diagram of what the female anatomy looks like and continued to talk. The defense eventually objected to the narrative form of the questioning at that point. But counsel also voiced concern that Dr. Burrell was getting

13

close to giving the ultimate conclusion, citing *State v. Lash*, 237 Kan. 384, 699 P.2d 49 (1985). The court ruled that basis for the objection was premature.

Using her diagram, Dr. Burrell explained what normal hymeneal tissue looks like. She explained that hymeneal tissue is not a sheet of tissue that tears the first time a girl has penetrative contact. "It is a rim of tissue, we expect it to be open. We saw a normal hymeneal rim of tissue on her if that's clear." A short time later, the State asked if S.G.'s normal exam would be inconsistent with her disclosure of prior penetration. Dr. Burrell responded, "No." At that point, the defense objected based on *Lash*. The court overruled the objection.

In our view, Dr. Burrell's testimony was admissible to assist the jury in understanding the material evidence. As the trial court aptly said, some jurors expect that in cases involving penetration of young females, there must be tearing or some other physical evidence of sexual intercourse. Dr. Burrell merely explained that was not the case.

We note that defense counsel, by reminding the jury that S.G. had "a completely normal intact hymen" in closing argument, did exactly what Dr. Burrell's testimony was designed to preempt. Dr. Burrell's testimony aided the jury in evaluating whether S.G.'s "intact hymen" necessarily precluded her contention that Williams had penetrated her.

This court's decision in *Humphrey*, 30 Kan. App. 2d at 24-26, offers further support. In *Humphrey*, the State's expert was permitted to testify the victim's injuries were consistent with blunt force penetrating trauma. The expert agreed on cross-examination that she could not say for certain how the injuries were caused. This court concluded such testimony did not invade the province of the jury. 30 Kan. App. 2d at 26. Here, Dr. Burrell merely stated that a normal exam result was not inconsistent with penetration.

Taking a different direction, Williams argues Dr. Burrell expressed her opinion of S.G.'s credibility and indicated her belief that S.G. was telling the truth. But Dr. Burrell did not express an opinion about S.G.'s credibility or whether she was truthful. The doctor was asked if S.G.'s normal exam result was inconsistent with her previous disclosure of penetration. Dr. Burrell simply responded, "No." The doctor did not express an opinion on whether there was penetration in S.G.'s case, just that it was possible to have a normal exam result and for there also to have been penetration.

Williams compares this case to *State v. Tully*, 293 Kan. 176, 204-05, 262 P.3d 314 (2011), and *State v. Bressman*, 236 Kan. 296, 301-03, 689 P.2d 901 (1984), both cases where emergency room doctors offered opinions that gave legal conclusions. In *Tully*, the Supreme Court found an emergency room doctor who testified that she had treated hundreds of "trauma victims" was not necessarily qualified to state an opinion on whether the lack of traumatic injury was counter to a finding of rape because there was no showing the doctor was qualified to know the elements of rape. 293 Kan. at 201, 204-05.

Here, Dr. Burrell's qualifications were never challenged. She testified that she was a child abuse and neglect pediatrician, that she had completed a 3-year fellowship for child abuse and neglect pediatrics medicine, that she was trained in performing sexual assault examinations, and that she had conducted hundreds of sexual assault examinations. More importantly, Dr. Burrell was not asked whether the normal exam result was consistent with the legal term of rape, she was asked specifically if a normal exam result was *inconsistent* with *penetration*.

Going further, in *Bressman*, an emergency medicine physician testified that she believed the alleged victim was raped based on her prior knowledge of rapes, her medical experience, the victim's story, and the findings that she put together with the tests and history. The physician testified that all of the tests she performed were negative and she

15

found no evidence of trauma. But she testified that the alleged victim's emotional state was consistent with a rape victim.

The Supreme Court found that the trial court committed prejudicial error in permitting the physician to testify that in her opinion the victim had been raped. There was no showing that the physician was trained as an expert in psychiatry. The court further held that the jury could properly assess the alleged victim's state of mind. 236 Kan. at 303.

Here, Dr. Burrell did not testify about S.G.'s mental state and did not give an opinion about whether S.G. had been assaulted. Moreover, Dr. Burrell's medical testimony was essential for the jury to properly assess whether the exam result contradicted S.G.'s allegations. Neither *Tully* nor *Bressman* support Williams' argument on appeal. We find no reversible error here.

*A trial court can limit the questions asked of the jury panel.*

For his final argument, Williams contends that the trial court prevented defense counsel from properly discovering the biases and prejudices of potential jurors by limiting defense counsel questions.

The purpose of voir dire examination of the jury panel is to allow the parties to select competent jurors free from bias, prejudice, or partiality. But the trial court has authority to reasonably control voir dire and speed up the process when it deems appropriate. *State v. Hudgins*, 301 Kan. 629, 635, 346 P.3d 1062 (2015). Indeed, the statute states that the trial court "may limit the examination by the defendant, his attorney or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose." K.S.A. 22-3408(3).

16

Because of this broad discretion, in order to obtain a reversal, the defendant must demonstrate:

- The trial court abused its discretion in limiting voir dire; and
- the defendant was prejudiced by the limitation. *Hudgins*, 301 Kan. at 634.

During voir dire, defense counsel asked if anybody was married to a police officer. There were no responses. Later, defense counsel asked, "Okay, we have a pretty small county here actually. Does anybody have any relatives, close relatives who—or you that you didn't put down on the questionnaire employed by anybody in the Unified Government or the courthouse?"

This prompted a long exchange between the court and defense counsel outside the presence of the panel where the court clearly wanted to speed things up:

"[THE COURT:] I have twice cautioned Mr. Lamb about attempting to solicit information during his voir dire that is, in fact, contained in the questionnaires that the jurors fill out and that both counsel received at about, oh, when did you get them, about 10:00 o'clock this morning or a little bit after and have from that time until noon or so to review. And Mr. Lamb apparently is unhappy with the court exercising its authority both under statute and case law to control voir dire.

"So, Mr. Lamb, what's your problem?

"MR. LAMB: Judge, my problem is I've been asking these same questions for 15 years. And for some reason I'm asking about uncles, cousins, other relatives that are not remotely on the—on the list about whether they have close relationship with police officers. And we ask that because maybe they are influenced by or come from a law enforcement family that is not reflected.

"THE COURT: I let you ask that question and there weren't any hands. You asked that question.

"MR. LAMB: I didn't even get the question out.

"THE COURT: Yeah, you did.

17

"MR. LAMB: And as far as—I just don't understand, Judge. I don't know, I seem to have always had a problem with voir dire in your court in the few times that I've shown up here. I don't know if it goes back 15 years ago when I filed a mandamus, I don't know. I don't know, Judge, I—

"THE COURT: Mr. Lamb, Mr. Lamb, now you're getting personal and out of control and you—

. . . .

"THE COURT:  And you should refrain from doing so. Quite frankly, your experience in this court or your experience over the last 15 years in any other court has absolutely nothing to do with this trial or any other trial. It is clearly, clearly within the bounds of this court's authority to set guidelines and limits and to control voir dire . . . . I don't believe asking people if they have relatives that work for the Unified Government is in any way relevant to any of the triable issues in this case. The Unified Government contains all kinds of departments that don't have anything to do with the issues involved in this case."

The jury questionnaire asked about spouse's employment, but not the employment of other relatives.

Defense counsel's question about whether anybody had relatives that worked for the Unified Government was indeed broad. It is entirely unclear how the answer would assist counsel in determining a potential bias, prejudice, or interest. Further, Williams does not explain how the question served a useful purpose and he did not then ask a less broad question. Also, Williams does not explain how he was prejudiced by the voir dire limitations set by the court.

We find no abuse of discretion here.

Affirmed.