NOT DESIGNATED FOR PUBLICATION

No. 120,558

COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

VALERIA PUENTE-FLORES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Opinion filed October 30, 2020. Reversed and remanded with directions.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., STANDRIDGE and GARDNER, JJ.

PER CURIAM: A jury convicted Valeria Puente-Flores (Mother) of aggravated battery and abuse of a child. Mother appeals, arguing the district court erred by admitting her confessions and excluding her expert witness. She also raises a claim of cumulative error. We agree that the district court erred by denying Mother's motion to suppress her confessions and that the State cannot prove that the error was harmless. We thus reverse Mother's convictions and remand for a new trial without the inadmissible statements.

1

*Factual and Procedural Background*

In December 2015, Mother gave birth to her child, M. Her birth was complicated because of Mother's gestational diabetes, pre-eclampsia, and other issues.

Three days before Mother was admitted to the delivery room, her amniotic fluid began leaking. Nearing delivery, Mother's pulse and blood pressure were elevated and she had a fever. As a result of Mother's prolonged amniotic leaking, M. took her first stool (meconium) in utero, thus contaminating Mother's amniotic fluid and raising the risk that M. would get an infection. M. also had a decelerated fetal heartrate, showing she may not have been getting enough blood to her brain. These complications left M. in a state of "fetal distress" for 1 1/2 hours, requiring an emergency cesarean section. Along with these complications, M. developed a "caput"—a bump formed on an infant's skull during labor indicating pressure on the skull during the birthing process. Doctors also discovered that Mother's placenta was severely infected.

At birth, M.'s Appearance, Pulse, Grimace, Activity, and Respiration (APGAR) score—assessing her responsiveness based on several characteristics such as heart rate, color, and breathing—was in the normal range, indicating M. was a "vigorous baby at birth." And M. tested normal when given a Kansas Newport Screen—testing for genetic abnormalities and other things that may require further evaluation. Still, M. was sent to the neonatal intensive care unit for treatment, where she remained for seven days.

Once home, M. lived with Mother and her boyfriend (Boyfriend). M.'s biological father was not involved with the family. Mother's parents did not live in Kansas, but Mother's aunt lived nearby and was present for M.'s birth.

M. was a healthy baby as evidenced by her medical records. She was, however, a fussy baby. Once, Mother and Boyfriend saw M.'s eyes roll back into her head while her

arms and legs began shaking, making them suspect she was having a seizure. Mother took M. to the pediatrician and told a nurse she thought that M. had suffered a seizure. But Mother did not relay that concern to M.'s pediatrician, and it was not documented in her medical records. A different pediatrician considered the symptoms weeks later and thought it unlikely that M. had experienced a seizure. She also ruled out the possibility that M.'s movements showed some other serious medical condition.

Mother returned to work on Tuesday, January 26, 2016, when M. was around seven weeks old. She took M. to a babysitter Tuesday through Thursday during her day shift. Thursday night, the 28th, Mother stayed up all night trying to get M. to fall asleep. During that time, Boyfriend heard Mother yell at M. to "shut up," both in Spanish and in English. The next morning, Boyfriend drove M. to her babysitter and Mother went to work. He noticed that M. appeared "a little yellow" and very pale.

While at the babysitter's that Friday, M. slept most of the day and did not drink any formula, which the babysitter found unusual. When Boyfriend picked M. up from the babysitter the evening of January 29, M. was not responding to her surroundings. As a result, Mother and Boyfriend took M. to a Topeka hospital, which quickly transported M. by air ambulance to Children's Mercy Hospital in Kansas City.

Doctors at Children's Mercy diagnosed M. with subdural brain and left eye retinal hemorrhaging. By that time, M. was also suffering from seizures. Doctors did not see any associated external bruising on M.'s body. But M.'s injuries led to severe brain damage, causing significant physical and mental disabilities. And the injuries were consistent with abusive head trauma.

In the early hours of Saturday, January 30, 2016, Detective Jason Judd gave *Miranda* warnings to Mother when he and Detective Lance Green questioned her in the waiting room of Children's Mercy. The detectives told Mother that they were

investigating M.'s injuries. During the interview, which lasted about an hour, Mother denied that she had shaken M. Mother showed the detectives how she had handled M. the night before; she did not demonstrate a violent shaking but a "cradling" and "rocking motion back and forth."

Detectives interviewed Mother again on February 5. Detectives Judd and Green went to Mother's home at about 8:30 a.m. and asked if she and Boyfriend would speak with them at the police station. The detectives also offered to give Mother and Boyfriend a ride to the station, as Mother had told them her car had quit working. Mother and Boyfriend agreed and rode in the detectives' vehicles to the police station.

Once at the station, the detectives placed Mother and Boyfriend in separate interrogation rooms. At first, Detective Judd questioned Boyfriend and Detective Green questioned Mother. Detective Judd advised Boyfriend of his *Miranda* rights right after beginning his questioning, but Detective Green never advised Mother of those rights. Detective Judd later joined Detective Green in questioning Mother. Nearly three hours into the interview, and after Mother made incriminating statements, Detective Judd gave Mother her *Miranda* rights after learning that Detective Green had not done so.

Mother's interview lasted around 3 1/2 hours. About half of that time, however, Mother was alone in the room. Mother eventually admitted that she had shaken M. in the early morning hours of January 29 and showed with a doll how she had done so. Detective Green thought that Mother's demonstration was "significantly" different than her demonstration during her interview at the hospital. Detective Green found Mother's reenactment at the hospital showed a much calmer and soothing rocking than what she demonstrated at the police station interview. During the police station interview, Mother "grabbed" or "took [M.] out of [a] swing, and then cradled [her]." Mother admitted at the police station that M.'s head may have bounced around and may have hit her chest as

4

Mother picked her up out of her swing. And Mother admitted that this happened when she took M. out of her swing five or six times during the early morning of the 29th.

During Boyfriend's interrogation, he told Detective Judd that Mother had said after their trip to the hospital that she "might have shaken the baby too hard and caused [M.'s] injuries." When confronted with this statement at the police station, Mother explained that she had told Boyfriend only that the police had told her that she had shaken M. too hard when cradling her. Boyfriend also testified that he had heard Mother yell at M. during the night of the 28th and 29th to "shut up."

The State charged Mother with knowing aggravated battery and child abuse in the form of a cruel and tortious beating. The State later amended the child abuse charge to allege that a shaking, rather than a beating, had occurred.

Before trial, Mother moved to suppress evidence of the incriminating statements she made during the interview at the police station. In her motion, Mother emphasized that she had not been given her *Miranda* rights until after she confessed. The district court denied Mother's motion, finding the interrogation was not custodial so no *Miranda* warnings were necessary.

The district court also held a pretrial *Daubert* hearing to address the admissibility of the parties' proffered expert testimony. See K.S.A. 2019 Supp. 60-456(b); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The district court found that the State's experts—Doctors Liza Murray and Ara Hall—were qualified to present expert testimony. But the district court precluded Dr. Hall from testifying that M.'s injuries resulted from shaking or shearing. The district court denied Mother's request for Dr. Thomas Young to present expert testimony that M.'s brain injury may have been caused by injuries sustained at birth or during later seizures or "hypoxic spells." The district court found that Dr. Young was not qualified to opine on

that issue, that his opinion was not based on reliable scientific evidence, and that his opinion would not help the jury. In a later hearing, the district court found Mother's other expert—Dr. Jennifer Johnson, a nurse practitioner—could testify but not on the issue of what caused M.'s injuries.

The district court also held a *Jackson v. Denno* hearing to establish the admissibility of Mother's confession to law enforcement during her interrogation at the police station. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). After an evidentiary hearing, the trial court held that Mother's statements at the police station were voluntarily and knowingly given, so they were admissible. Mother does not challenge that finding on appeal.

Mother's jury trial was in September 2018. The State called several witnesses including Dr. Murray. She testified that the only possible cause of M.'s subdural and retinal hemorrhaging was abusive head trauma. And based on her review of M.'s birth records, Dr. Murray contended that M. had not suffered a brain injury during birth. Mother did not testify.

The jury convicted Mother of a lesser included charge of reckless aggravated battery and child abuse. The district court sentenced Mother to 31 months in prison with a 24-month term of postrelease supervision.

Mother timely appeals.

*Did the District Court Err in Admitting Mother's Confessions?*

Mother first contends that the district court erred by denying her motion to suppress the inculpatory statements she made during her interview with detectives on February 5, 2016, at the police station. Mother argues that her statements were not

admissible because she was not given *Miranda* warnings before the detectives subjected her to a custodial interrogation. The State argues that the district court correctly found that the interrogation was noncustodial and thus did not trigger *Miranda*. Alternatively, the State argues that the admission of Mother's statements at trial was harmless error because the jury would have convicted her based on other evidence, even if her statements had been excluded.

*Standard of Review*

We use a dual standard of review to address a district court's decision on a motion to suppress. We first review the trial court's factual decisions under a substantial competent evidence standard. In doing so we do not reweigh the evidence, assess witness credibility, or resolve conflicting evidence. Then we review de novo the ultimate legal conclusions that the trial court made. *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015); see *State v. Lewis*, 299 Kan. 828, 834-35, 326 P.3d 387 (2014) (applying this bifurcated standard when determining whether an interrogation is custodial). "Substantial evidence" refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

*Analysis*

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These safeguards require an officer to inform the accused that "he has a right to remain silent, that any statement he does make may be

used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

These *Miranda* warnings are required only for custodial interrogations but not for investigatory, noncustodial interrogations. *State v. Jacques*, 270 Kan. 173, 186, 14 P.3d 409 (2000).

> "The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. As custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012); see *State v. Bridges*, 297 Kan. 989, 1002, 306 P.3d 244 (2013)." *Lewis*, 299 Kan. at 834-35.

Mother was not given *Miranda* warnings when her interrogation began at the police station. Detective Green had taken her to the police station because it had recording equipment in the interview rooms, so they do all their interviews there. He began the interrogation. He testified that he did not give Mother *Miranda* warnings because he did not view her as a suspect, did not think she was in custody, and he lacked probable cause to arrest her. Detective Judd interrogated Mother later during that interview, after she made incriminating statements. When Detective Judd learned that Detective Green had not warned her, he said they needed to do so because she had become a suspect in the case and had made incriminating statements. When Detective Judd was asked whether the officers had made a tactical decision before the interview not to read *Miranda* initially, but to read it later, he testified that nothing like that was discussed. Detective Judd read *Miranda* warnings to Boyfriend at the beginning of his interrogation at the police station because Boyfriend was at the top of his suspect list and Detective Judd had taken him into custody on the night of the incident, for unrelated

events. Detective Judd had also *Mirandized* Mother at the hospital early in the investigation when he did not know where the investigation would go. Still, Mother spoke to them at the hospital.

Because the parties do not dispute that detectives interrogated Mother at the police station, the sole issue is whether she was in custody at the time. We analyze each case on its own facts. *Lewis*, 299 Kan. at 835. An interrogation is custodial if, using an objective standard, a reasonable person, under the totality of the circumstances, would have felt he or she was not at liberty to terminate the interview. *State v. Swindler*, 296 Kan. 670, 682, 294 P.3d 308 (2013).

> "At the heart of the custody analysis, the court must ultimately determine as a matter of law whether, under the totality of the circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. *State v. Bridges*, 297 Kan. 989, 1009, 306 P.3d 244 (2013) (citing *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 [2012]); see *Thompson v. Keohane*, 516 U.S. 99, 113-14, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) ('[I]f encountered by a "reasonable person," would the identified circumstances add up to custody as defined by *Miranda*?')." *State v. Guein*, 309 Kan. 1245, 1254, 444 P.3d 340 (2019).

A custodial interrogation differs from an investigatory interrogation, which occurs as a routine part of the fact-finding process before an investigation reaches the accusatory stage. *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018).

Factors a court may consider in analyzing whether an interrogation is custodial include: (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person was escorted by the

9

police to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No one factor outweighs another, nor do the factors bear equal weight. *Lewis*, 299 Kan. at 835.

Detectives Judd and Green testified at the hearing on Mother's motion to suppress. The district court also watched most of the unredacted version of the video of Mother's interrogation with the detectives. The district court applied the facts from the suppression hearing to the factors referenced above and found that almost all the factors pointed to a noncustodial interrogation.

As we explain below, we disagree with the district court's ultimate legal conclusion because nearly all the factors favor Mother. The circumstances establish that the encounter was custodial; a reasonable person would not have felt free to terminate the interrogation and disengage from the encounter. Compare *Guein*, 309 Kan. at 1254, and *Swindler*, 296 Kan. at 682, with *State v. Torres*, 280 Kan. 309, 325, 121 P.3d 429 (2005) (affirming the district court's noncustodial finding in a shaken baby case).

### *Pre*-Miranda *statements*

Mother made incriminating statements both before and after officers gave her *Miranda* warnings. To determine whether the district court erred in denying Mother's motion to suppress her pre-*Miranda* statements, we analyze custody using a de novo review. *Lewis*, 299 Kan. at 835.

We agree with the district court that factors three, five, and eight support finding the interrogation was noncustodial:

- Factor Three: For much of the interrogation, only one officer was present and, at most, only two officers questioned Mother. See *State v. Warrior*, 294 Kan. 484, 498, 277 P.3d 1111 (2012) (presence of two officers did not impact decision about custody); but see *Guein*, 309 Kan. at 1256 ("while only two officers were involved, their one-to-one ratio to the car's occupants allowed a show of authority specific to each").

- Factor Five: No evidence showed that Mother was restrained or that the door was guarded. Mother's argument that the State had to prove that the door was not guarded is conclusory and unsupported. See *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018) (a point raised incidentally is considered waived); *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (an unsupported point is considered waived).

- Factor Eight: The detectives released Mother after the interrogation was over and drove her home as promised.

The remaining factors, however, require a more detailed analysis.

*Factor One: The place and time of the interrogation*

Detective Green and another detective drove Mother to the interrogation in the morning. The interrogation occurred at the police station. Once Mother arrived at the police station, she was taken to a different interrogation room than Boyfriend. These facts favor her interview being custodial. See *Warrior*, 294 Kan. at 497 (finding questioning in a police station favors an interview being custodial); *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1079, 337 P.3d 691 (2014) (recognizing interrogation rooms impart a sense of isolation and can be coercive).

11

*Factor Two: The duration of the interrogation*

Altogether, Mother's interrogation lasted over three hours, but Mother began to make her pre-*Miranda*, incriminating statements around 2 1/2 hours into the interrogation. Although the detectives gave Mother several long breaks from questioning and repeatedly offered her food, water, and bathroom breaks, Mother chose to leave the interrogation room only once. That all seems pretty typical. But another consideration in analyzing this factor is "whether officers *immediately* exert their authority or ask questions without advising the person he or she is free to leave or to decline answering them." *Guein*, 309 Kan. at 1255. Here, Detective Green immediately and repeatedly asked Mother questions without advising her that she was free to leave or to decline answering his questions.

*Factor Four: The conduct of the officers and the person subject to the interrogation*

The interrogation began with Detective Green insinuating that Mother had not been honest in her previous interview and warning Mother that criminal charges could arise based on the seriousness of M.'s injuries. Later, Detective Green explicitly told Mother more than once that either she or Boyfriend was lying. Detective Green also consistently told Mother that either she or Boyfriend was responsible for M.'s injuries. And Detective Green told Mother "where we all go depends on you."

As for conduct, Detective Green questioned Mother aggressively at times and sometimes slapped his hand on the table when pushing Mother to give him more information. Mother appeared physically and emotionally uncomfortable, crying throughout the interview and at times grabbing her stomach. She began crying uncontrollably just before making her incriminating statements. Yet that response could be because of her regret for or recognition of what she had done to her baby rather than

12

because of any coercion by the officers. In fact, the district court held a *Jackson v. Denno* hearing and found that Mother's confession was made voluntarily. At several points in the interview, Mother emotionally told Detective Green that she did not know what had happened to M. Although detectives did not tell Mother she was under arrest, they told her they would take her home after the interview was over. Still, Mother likely did not think that she had the power to determine when the interview was over.

Detective Judd gave *Miranda* warnings to Boyfriend at the beginning of his interview, which dealt with the same crime that Detective Green told Mother either she or Boyfriend had committed. When Detective Judd learned that Detective Green had not read Mother her *Miranda* rights, he returned to the interrogation room and almost immediately notified Mother of them. Although Detective Judd did not testify that Mother should have received the *Miranda* warnings earlier—instead testifying that they owed Mother an "opportunity to have an attorney" after she made incriminating statements—the timing of his actions appears to be remedial. Had Detective Judd interrogated Mother, instead of Boyfriend, we suspect he likely would have given her *Miranda* warnings at the outset.

*Factor Six: Whether the person is being questioned as a suspect or a witness*

Detective Green, when asked if Mother was a suspect when he interrogated her at the police station, answered: "[a]nything was open at the time. I did not view her as a primary suspect at that point. We weren't even necessarily positive that this was a criminal act at that time." Detective Judd testified that Boyfriend was his primary suspect but did not state that Mother was not a suspect when she was questioned at the police station. Both detectives testified that Mother became a suspect only after she made incriminating statements during that interview.

13

But whether the interrogating officers had focused their suspicions upon the individual being questioned is not relevant for purposes of *Miranda* if those suspicions are not disclosed to the defendant. *State v. Ewing*, 258 Kan. 398, 401-03, 904 P.2d 962 (1995) (citing *Stansbury v. California,* 511 U.S. 318, 114 S. Ct. 1526, 128 L. Ed. 2d 293 [1994], and holding that an officer's knowledge or beliefs may influence the custody issue if they are being conveyed by word or deed to the individual being questioned, but they are relevant only to the extent they would affect how a reasonable person would gauge his or her freedom of action). Here, detectives conveyed by word or deed to Mother at the police station that she was a suspect in M.'s injuries. Mother told Detective Green that she knew he and Detective Judd thought she shook M., and Detective Green did not correct Mother's stated suspicion. Rather, Detective Green responded by asking Mother how she shook M., confirming her suspicions. And the accusatory tone and intense repetition of pointed questions reflects that at all times during her interrogation at the police station Mother was being questioned not just as a witness but as a person of interest in the crimes.

*Factor Seven: How the person got to the interrogation location*

One of the detectives drove Mother to the police station, as she had told them her car was not working. So Mother did not arrive at the police station on her own power, although she did so voluntarily and sat in the front seat. Yet during the interview, no one offered to take her home, or asked whether she wanted to go home. Nor did detectives tell her she had to stay and answer their questions until they said she could leave. Still, during the interrogation, Mother did not appear to have a cell phone or wallet with her, or any other way that she could go home if she wanted to leave. Boyfriend had no vehicle there so he could not give her a ride. Instead, Mother was dependent on the detectives to take her home.

14

The individual circumstances, viewed separately, may not be enough to establish that the interrogation was custodial. See *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (being questioned as a suspect or in a police station does not alone necessarily trigger need for *Miranda* warnings); see also *Warrior*, 294 Kan. at 503 (the fact a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings); *State v. Stone*, 291 Kan. 13, 32, 237 P.3d 1229 (2010) (acknowledging that any one of the circumstances surrounding the interrogation, standing alone, might not have led the court to conclude the statements were coerced); *State v. Trussell*, 289 Kan. 499, 507-08, 213 P.3d 1052 (2009) (citing cases in which defendants were interviewed at police station but were not in custody for *Miranda* purposes); *State v. Deal*, 271 Kan. 483, 498-99, 23 P.3d 840 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006) (holding a three-hour interview was noncustodial); *Jacques*, 270 Kan. at 186-87 (finding a two-hour interview to be noncustodial). But here, as in *Guein*, the totality of the circumstances convinces us that the detectives' interrogation of Mother was custodial, triggering the need to provide Mother with *Miranda* warnings. Her prewarned statements must thus be suppressed.

*Post*-Miranda *Statements*

Although Mother's pre-*Miranda* statements must be suppressed, it does not necessarily follow that her post-*Miranda* statements must also be suppressed. See *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) (addressing admissibility of subsequent voluntary statement made by a suspect); *United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006).

Mother argues, as she did to the district court, that her post-*Miranda* statements should be suppressed as in *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). The State counters that *Seibert* does not apply because Mother was not in custody, no *Miranda* violation occurred, and the failure to give *Miranda* warnings was

not intentional, as it was in *Seibert*. We have resolved the first two of these counterpoints against the State. We are left to grapple with whether *Seibert* applies here.

In *Seibert*, a plurality opinion, the United States Supreme Court condemned a two-step interrogation technique, finding the officer involved intentionally violated *Miranda*. *Seibert*, 542 U.S. at 604. Seibert was arrested for murder and was interrogated by police without receiving *Miranda* warnings. After Seibert made an incriminating statement, the police gave her a 20-minute break, turned on a tape recorder, read her *Miranda* warnings, and obtained a signed waiver of her *Miranda* rights. The interrogating police officer then questioned Seibert using information Seibert had provided before receiving *Miranda* warnings. Seibert moved to suppress both her prewarning and postwarning statements. At the suppression hearing, the interrogating officer admitted that he had intentionally withheld the *Miranda* warning as an interrogation technique that he had been taught— "question first, then give the warnings, and then repeat the question" until the defendant provided the answer she had already given. *Seibert*, 542 U.S. at 606. The officer admitted that it was common practice to elicit confessions before administering *Miranda* rights. And he testified that the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession was promoted not only by his own department, but by a national police training organization and other departments in which he had worked.

The *Seibert* Court held that this two-step strategy undercut *Miranda*'s goal of reducing the chances of admitting a coerced confession, and under the facts, the warnings were unlikely to serve their intended purpose. Thus the Court held that the post-*Miranda* statements were inadmissible. *Seibert*, 542 U.S. at 617.

The *Seibert* Court distinguished its earlier decision in *Elstad*, which held that a suspect who has answered inadvertently unwarned, uncoercive questions may validly waive his rights and provide an admissible statement after being warned:

"[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Elstad*, 470 U.S. at 314.

In contrasting *Elstad*, the *Seibert* plurality—joined by four Justices—held that the question to address when this two-step technique is used is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611-12. The plurality then identified five relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object:

"[T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615.

These factors control regardless of the intent of the interrogating officer. According to the plurality, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here . . . the focus is on facts apart from intent that show the question-first tactic at work." 542 U.S. at 616 n.6. So under the plurality's test, the State errs in asserting that *Seibert* applies only when an officer's intentional evasion of *Miranda* is shown.

Justice Kennedy wrote a concurring opinion, advocating a narrower test to determine the admissibility of post-*Miranda* warning statements. He found the test fashioned by the plurality which "applies in the case of both intentional and unintentional two-stage interrogations . . . cuts too broadly." *Seibert*, 542 U.S. at 621-22 (Kennedy, J.,

17

concurring). He proposed a "narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." 542 U.S. at 622 (Kennedy, J., concurring). Justice Kennedy specified:

> "The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Siebert*, 542 U.S. at 622 (Kennedy, J., concurring).

So which test applies here? Both Mother and the State contend Justice Kennedy's test should apply. This is apparently in keeping with the general rule that when a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States,* 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977). But applying that rule to *Seibert* is problematic:

> "In practice, however, the *Marks* rule produces a determinate holding 'only when one opinion is a logical subset of other, broader opinions.' *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). When the plurality and concurring opinions take distinct approaches, and there is no 'narrowest opinion' representing the 'common denominator of the Court's reasoning,' then *Marks* becomes 'problematic.' [950 F.2d at 781-82]. We do not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive. *See Homeward Bound, Inc. v. Hissom Mem'l Ctr.*, 963 F.2d 1352, 1359 (10th Cir. 1992) (*citing King*, 950 F.2d at 782).

18

"Determining the proper application of the *Marks* rule to *Siebert* is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1138-41 (9th Cir. 2005) (Berzon, J., dissenting in part). As Judge Berzon explained, 'three of the four Justices in the plurality *and* the four dissenters decisively rejected any subjective [test] . . . based on deliberateness on the part of the police.' [Citations omitted.]" *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006).

The Kansas Supreme Court has not addressed this issue. It has applied the *Seibert* plurality's factors, without directly deciding the issue. See *Lewis*, 299 Kan. at 839 (applying the *Seibert* factors but also recognizing lack of evidence of intent to undercut *Miranda*). Yet it has most recently characterized *Seibert* parenthetically by summarizing Justice Kennedy's test.

"See, e.g., *Missouri v. Seibert*, 542 U.S. 600, 617, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (when investigators intentionally employ two-step interrogation strategy, postwarning statements related to substance of prewarning statements must be excluded unless curative measures taken before postwarning statement is made)." *State v. Parker*, 311 Kan. 255, 258, 459 P.3d 793 (2020).

We find it unnecessary to determine which opinion in *Seibert* constitutes the holding of the case. Rather, we find that Mother's post-*Miranda* statements are inadmissible under both tests set forth by the plurality and Justice Kennedy. See *Carrizales-Toledo*, 454 F.3d at 1151 (so doing).

Seibert *plurality's five factors*

Regardless of whether the detectives' acts were calculated to undermine the *Miranda* warning, if we apply the plurality's five "relevant facts" to this case, we find that the midstream *Miranda* warning given to Mother was insufficient to inform her that she could choose whether to continue her confession in the second interrogation.

19

Under the first factor, we look at "the completeness and detail of the questions and answers in the first round of interrogation." *Seibert*, 542 U.S. at 615. Detective Green began by telling Mother that things had become pretty serious, that serious criminal charges against her or Boyfriend were possible, and that her custody of M. was on the line. They confronted her with Boyfriend's statement that she had yelled "shut up" at M. in the middle of the night and that she had told Boyfriend she may have shaken M. too hard. When Mother denied the latter statement, they told her that doctors who specialized in this kind of injury said the baby had been shaken, that her injuries did not happen at birth, and that they had occurred shortly before she arrived at the hospital. Mother then agreed to take a polygraph test. After leaving Mother alone for around 20 minutes, both detectives entered the room. Mother, who had been in the interrogation room for around 2 1/2 hours by then, confessed soon after. Here, as in *Seibert*, the detectives' initial questioning appeared to be "systematic, exhaustive, and managed with psychological skill." 542 U.S. at 616.

Similarly, Mother's prewarned confession was complete and detailed. So too was her post-*Miranda* confession. In both, she admitted to shaking M., repeatedly getting M. out of her swing, and to repeating her sequence of actions five or six times. In both, Mother demonstrated her actions with a doll the detectives gave her. Mother's acts show that Mother shook M. in the swing, then took her out of the swing aggressively or roughly and brought her up swiftly to Mother's shoulder, causing M.'s head to hit Mother's shoulder. The length and intensity of the detective's initial questioning increased the likelihood of undermining the *Miranda* warnings later given to Mother.

The second factor is the extent of "the overlapping content of the two statements." *Seibert*, 542 U.S. at 615. The content of Mother's pre-*Miranda* and post-*Miranda* incriminating statements overlaps substantially, if not completely. Mother did not give the detectives any new or significant information during her post-warning interrogation. Here, as in *Seibert*, the interrogating officers covered the same ground in both rounds of

20

questioning, which the plurality believed could aggravate "any uncertainty on [the suspect's] part about a right to stop talking about matters previously discussed." 542 U.S. at 616.

The third and fourth factors are "the timing and setting of the first and second" interrogations and "the continuity of police personnel," respectively. 542 U.S. at 615. Mother's post-*Miranda* interrogation followed on the heels of her pre-*Miranda* interrogation, and was in the same place by the same officers. The lack of any time lapse between the first and second interrogation, the questioning by the same officers, and the lack of any change in location would all convey to Mother that the second round of questioning was not "a new and distinct experience" but a "coordinated and continuing interrogation." *Seibert*, 542 U.S. at 613, 615.

During both confessions, only one detective was present at times, and both detectives were present at other times. No clear break separated the first round of questions from the second. Instead, Detective Judd reentered the room after a short break and asked Mother to write an apology letter to M., describing the events she had just discussed. As Mother began crying in response to this request, Detective Judd told Mother he needed to read her something. He then read Mother her *Miranda* warnings while she continued to cry. Then Mother curtly acknowledged that she understood her rights before Detective Judd returned to asking Mother to write a letter to M. and to show them how she shook M. using the doll provided earlier. Under these circumstances, the midstream *Miranda* warnings were less likely to have had their intended effect.

The fifth factor is "the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615. *Seibert*'s plurality expressed concern that when an officer in the second interrogation refers back to the confession already given, references could create the impression that the second interrogation was a "mere continuation" of the first, and that it would be "unnatural" for

the suspect "to refuse to repeat . . . what had been said before." 542 U.S. at 616-17. The record does not reflect that either detective expressly referred to Mother's pre-warned confession after her *Miranda* warning.

We contrast our facts to those in *Lewis*, 299 Kan. at 839, where the court found "this is not a *Seibert*-type case" based on these facts:

- The pre-warning interview lasted only 10 minutes with nothing of substance revealed;
- Defendant did not admit involvement in the crimes, and the detective did not ask whether he was involved;
- A different person issued the *Miranda* warnings before the second interview;
- Neither the detective nor the agent tried to elicit an unwarned confession from the defendant or exploit any unwarned statements after the *Miranda* warnings were given; and
- Defendant showed he understood his rights when he terminated the second interview and asked for an attorney.

Mother's circumstances are instead much like those in *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005). There, our Supreme Court held that the State failed to meet its burden to show that Swanigan's second statement to police was untainted by his first statement, because: (1) Swanigan's second statement occurred about 19 hours after his first; (2) the same police officers were present for both statements; (3) both interviews took place at the police station; and (4) Swanigan repeated the same general facts. The court also noted that no intervening circumstances were shown which would have attenuated and dissipated the coercive effects of the first interrogation, except for the passage of time. 279 Kan. at 22-23. Here, we do not even have that. The factors lead us to conclude that the second interrogation was tainted by the first.

22

The detectives' acts undercut *Miranda*'s goal of reducing the chances of admitting a coerced confession and made the warnings unlikely to serve their intended purpose. Thus, under the *Seibert* plurality's test, Mother's post-*Miranda* statements are inadmissible. See *Seibert*, 542 U.S. at 617. Under these circumstances, the district court erred in denying Mother's motion to suppress all her statements made during her second interrogation at the police station.

### *Justice Kennedy's test*

The parties suggest that we should apply the test in Justice Kennedy's concurrence in *Seibert*. But we reach the same conclusion even if we apply that "narrower test." 542 U.S. at 622 (Kennedy, J., concurring). Justice Kennedy maintained that unless "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning," the courts should follow "the principles of *Elstad*" when determining the admissibility of postwarning statements. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Yet the State does not cite *Elstad*.

The evidence suggests that Detective Green may have deliberately failed to provide *Miranda* warnings in the hope that Mother's unwarned statements would cause her to give more information in a later interview conducted after *Miranda* warnings were given. He and Detective Judd had interrogated Mother five days earlier at the hospital, and they gave her *Miranda* warnings then. Yet five days later, when Detective Green believed the medical evidence established even more—that M.'s injuries had been caused by shaking and not by her birth—he made a conscious decision not to warn Mother, even though he took her to the police station and intensely and accusatorily questioned her at length. Detective Green testified that because Mother was not in custody, and he lacked probable cause to arrest her before she confessed, he decided not to *Mirandize* her. But his acts and statements shown on the video appear designed to wring a confession out of Mother without giving her *Miranda* warnings. And although both Detectives Green and

23

Judd testified, neither characterized their failure to give Mother *Miranda* warnings as mere inadvertence. Although the facts do not show an admission or evidence that the detectives made a tactical decision to evade *Miranda*'s protections to the same extent as in *Seibert*, Detective Green's decision not to give Mother *Miranda* warnings was deliberate. It is thus unlike the inadvertent failure to warn in *Elstad*. On balance, we find the detectives' acts here are more like those in *Seibert* than those in *Elstad*. We thus treat this case as though the detectives intentionally used a two-step interrogation strategy.

Under Justice Kennedy's test, when investigators intentionally employ a two-step interrogation strategy, postwarning statements related to the substance of prewarning statements must be excluded unless they take curative measures before the suspect makes postwarning statements. Mother's postwarning statements all related to the substance of her prewarning statements, so they must be excluded absent curative measures.

What kind of curative measures are enough?

"Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Cf. *Westover v. United States*, decided with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).

Here, as in *Seibert*, officers took no curative measures. There was no break in time, place, persons, or the kind of accusatory questions being asked. And detectives made no additional warning explaining to Mother that her prewarning custodial statements were likely inadmissible. The lack of curative measures is underscored by the

five relevant facts addressed above, which *Seibert*'s plurality adopted. So under either Justice Kennedy's test or the *Seibert* plurality's test, we must exclude Mother's post-*Miranda* confession.

Our review of our other cases applying *Seibert* confirms this result. See, e.g., *State v. Jones*, 283 Kan. 186, 201-03, 151 P.3d 22 (2007), *disapproved of on other grounds by State v. Nelson*, 291 Kan. 475, 243 P.3d 343 (2010) (finding even if *Seibert* applied, no taint was shown where the defendant was not in custody for the first interrogation, and the second was held at a different location where the questions became more detailed); *State v. Arriaga*, No. 112,831, 2016 WL 938356, at *5 (Kan. App. 2016) (unpublished opinion) (finding no taint when the few questions that were not "routine booking questions" related to actions isolated from the charges discussed post-*Miranda*, Arriaga never made an admission during the initial round of questioning, and although the officer continued the interview without an identifiable break, he did signify a distinction between the first round of questions and the second by providing the *Miranda* warnings on a printed sheet, removing Arriaga's handcuffs, and focusing on the criminal allegations against Arriaga); *State v. Neal*, No. 108,273, 2014 WL 1795755, at *12 (Kan. App. 2014) (unpublished opinion) (distinguishing *Seibert* by finding officer did not intentionally refrain from giving *Miranda* warnings, and no evidence showed that any coercive effects of the single question in the patrol car, which the district court properly suppressed, needed to be dissipated before the police officers could question Neal at the police station); *State v. Hubbel*, No. 104,175, 2011 WL 2694620, at *5-6 (Kan. App. 2011) (unpublished opinion) (finding no taint where officer testified that this question-first technique was not the procedure commonly followed or recommended, he did not get a full confession from Hubbel before administering *Miranda* rights, and Hubbel was not questioned twice; he was asked one question at the initial stop and then was later questioned at the police station after waiving his *Miranda* rights). The facts here are significantly different from the facts in these cases, compelling a different result.

*Harmless Error*

The State argues that even without Mother's incriminating statements made at the police station, the jury would have still convicted Mother based on other testimony admitted at trial. That testimony is substantial, including testimony by medical personnel that M.'s injuries were not caused by or present at her birth, and Mother's admissions to M.'s babysitter and to Boyfriend that she shook M. but did not mean to harm her. Mother has not responded to the State's harmless error argument.

An officer's failure to provide a defendant with *Miranda* warnings before a custodial interrogation is subject to a harmless error analysis. See *State v. Hebert*, 277 Kan. 61, 71, 82 P.3d 470 (2004). The State bears the burden of proving beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, i.e., there is no reasonable possibility that the error contributed to the verdict. *State v. Sherman*, 305 Kan. 88, Syl. ¶ 8, 378 P.3d 1060 (2016).

The State first argues that overwhelming evidence from medical witnesses established that M.'s injuries resulted from abuse inflicted after M.'s birth.

*Dr. Murray's testimony*

Dr. Murray explained that M.'s medical records showed nothing that would indicate she suffered any kind of brain injury during birth or that she had any pre-existing medical conditions that would have contributed to her injuries. Dr. Murry testified that "[M.] didn't have any clinical evidence of any semblance of a devastating hypoxic injury at birth." And "by all indications, [M.] herself, was totally healthy at birth." Dr. Murray also explained that "[M.] did not have evidence of chronic subdural hemorrhage."

Dr. Murray concluded that the baby "presented with a history, with findings, with radiographic evidence that is consistent with abusive head trauma."

> "[I]n this case, [M.] had an acute alteration in her mental status. She presented with seizures, not looking well, not acting normally. She had subdural hemorrhages. She had diffuse brain injury. And she had extensive, too numerous to count, multi-layered retinal hemorrhages.
>
> "And so, in looking at that presentation, she had no evidence of a medical condition that would cause these things. And we know, based on a wealth of research and information, that trauma[,] and abusive trauma specifically, can cause this group of findings."

### Dr. Hall's testimony

Dr. Hall testified about her review of M.'s computed tomography (CT) scan. She was "confident that [M.'s] injury happened within hours to days prior" to M.'s admission to the hospital in January. If M. had suffered a brain injury at birth, she would have expected to see evidence of brain atrophy on the images from January 30 and February 1, but she saw none. Dr. Hall found it likely that doctors would have known if M. suffered from a severe injury because of a lack of oxygen at birth because those babies "act very different from babies who are well." Dr. Hall also explained that a baby who suffers such an injury would not receive a good APGAR score. M. had a good APGAR score.

But the State ignores other testimony, and our duty in reviewing for harmless error compels us to review the entire record. See *Sherman*, 305 Kan. 88, Syl. ¶ 8. Mother's theory was that M.'s brain injuries were caused by fetal hypoxia or prior seizures. Mother and Boyfriend both testified to an undated event before January 28, which they characterized as a possible seizure. Mother and Boyfriend saw M.'s eyes roll back into her head while her arms and legs began shaking. Mother took M. to the pediatrician and told a nurse she thought that M. had suffered a seizure.

27

And Mother presented expert testimony from Dr. Johnson that M.'s injuries may have been caused by something other than abuse. Dr. Johnson testified that M. suffered from severe birth complications, including a possible "hypoxic event" in which M. would not have received enough blood to her brain. Dr. Johnson also suggested that M.'s birth records may not have been complete enough to do a thorough investigation of the effects of M.'s late fetal decelerations during birth. She testified that although it is rare, other conditions could mimic the symptoms of abuse by shaking, and that M. did not have any external injuries such as bruises or lacerations. So the medical testimony is not as clear as the State suggests.

The State then argues that the evidence also shows that Mother was the person who abused M. The State relies on testimony from Boyfriend, written messages from Mother to the babysitter, and the babysitter's testimony. We have reviewed in detail the evidence offered at trial. We agree that it contains circumstantial evidence that Mother was the abuser. And it includes multiple admissions from Mother other than in her interrogation at the police station that she shook M. on the night of the 28th and 29th. But in all of them, Mother consistently denied having shaken M. hard, although she admitted she picked her up repeatedly. Mother consistently demonstrated only a gentle, rocking motion when she showed Boyfriend and the detectives how she handled M.

Only Mother's statements and acts during her interrogation at the police station went further. Only then did Mother admit that when she picked M. up out of her swing, she picked her up "pretty hard." Only then did the video of Mother's acts show that M.'s head may have bounced around and hit Mother's chest when she did so. And only then did Mother admit that she did so five or six times that night. The jury's finding that Mother abused M. was thus likely due in part to Mother's inculpatory statements and actions on the video from her interrogations at the police station.

28

The State asks us to view only some of the evidence and to conclude that the jury had ample evidence to find Mother guilty of the crimes charged. But that invitation misstates the State's burden and our duty in a harmless error analysis. Having reviewed all the evidence, we cannot say that there is no reasonable possibility that the error in admitting Mother's statements made at the police station contributed to the verdict. We thus reverse and remand for a new trial at which Mother's statements made at the police station are not admissible.

*Did the District Court Abuse its Discretion in Excluding Mother's Expert Testimony?*

Mother asserts that the district court erroneously denied her the opportunity to present expert testimony supporting a non-abuse explanation for M.'s brain injury. We reach this issue because it is likely to arise on remand.

Mother sought to admit testimony from Dr. Young that M.'s injuries were caused by birth complications and seizures. Defense counsel proffered Dr. Young's anticipated trial testimony during a *Daubert* hearing, but the district court excluded it. Mother asserts that this was an abuse of discretion, and that the exclusion of Dr. Young's testimony violated her constitutional right to present a theory of defense at trial.

*Standard of Review*

We generally review a district court's admission of expert testimony for an abuse of discretion. A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Lyman*, 311 Kan. 1, 21, 455 P.3d 393, *cert. denied* 2020 WL 3492732 (June 29, 2020).

When the exclusion of expert witness testimony infringes on a defendant's constitutional right to present the theory of his or her defense, we exercise unlimited

29

review. To determine whether the exclusion of expert testimony implicates a defendant's constitutional rights, we must consider the particular facts of a case. *State v. White*, 279 Kan. 326, 331-33, 109 P.3d 1199 (2005), *disapproved of on other grounds by State v. McLinn*, 307 Kan. 307, 409 P.3d 1 (2018). But not every decision to exclude evidence proffered by a criminal defendant amounts to a constitutional violation. *State v. Wells*, 297 Kan. 741, 759, 305 P.3d 568 (2013).

*Mother's Right to Present her Theory of Defense was not Violated.*

A defendant is entitled to present his or her theory of defense. The exclusion of evidence that forms an integral part of the defendant's theory of the case violates the defendant's fundamental right to a fair trial. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003); see *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). Mother's theory of defense was that something other than abuse caused M.'s injuries. But a defendant's right to present a defense is not without limits, including statutory rules and caselaw interpreting rules of evidence and procedure. See *State v. Bornholdt*, 261 Kan. 644, 654-55, 932 P.2d 964 (1997).

The district court found Dr. Young unqualified to present expert testimony in this case. Dr. Young sought to opine that M.'s injuries might have been caused by hypoxia during birth. He proposed to testify that shaken baby syndrome is always a misdiagnosis because a person cannot shake a child vigorously enough to cause torn vessels, brain swelling, subdural hemorrhaging, or retinal hemorrhaging. He based his opinion in part on a study that exposed monkeys to whiplash to determine whether shaking could produce the effects of hemorrhaging. Yet Dr. Young agreed that the models used in that study do not replicate a human baby's anatomy.

Our review of the record shows that the district court permitted Mother to present evidence that M.'s injuries may have been caused by something other than abuse. Mother

30

presented expert testimony from Dr. Johnson. She testified that M. suffered from severe birth complications, including a possible "hypoxic event" in which M. would not have received enough blood to her brain. Dr. Johnson also suggested that M.'s birth records may not have been complete enough to do a thorough investigation of the effects of M.'s late fetal decelerations during birth. She testified that although it is rare, other conditions could mimic the symptoms of abuse by shaking, and that M. did not have any external injuries such as bruises or lacerations. Thus the district court's exclusion of Dr. Young's proposed expert testimony did not deprive Mother of her constitutional right to present her theory of defense.

*Basic Rules Governing Admission of Expert Testimony*

We next consider whether the district court abused its discretion by excluding Dr. Young's proposed expert testimony.

K.S.A. 2019 Supp. 60-456(b) governs the admission of expert testimony:

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

This statute "is substantively identical to Federal Rule of Evidence 702" and follows the holding in *Daubert*, 509 U.S. 579. *In re Cone*, 309 Kan. 321, 325, 435 P.3d 45 (2019).

"Under our statute, as under F.R.E. 702, the court must decide first whether the expert is qualified 'by knowledge, skill, experience, training or education' to render an opinion." *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 494, 369 P.3d 966 (2016).

31

Proposed expert testimony must therefore "fall 'within the reasonable confines' of [the witness'] expertise." *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013). A court has broad discretion on this issue. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 70, 274 P.3d 609 (2012) (qualification of an expert lies within the broad discretion of the trial court). If an expert is qualified, the court must then satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony. *Smart*, 52 Kan. App. 2d at 494.

The district court held that Dr. Young was not qualified to testify that M.'s brain injury and subdural hemorrhaging—which presented at eight weeks after birth—was caused by hypoxia during birth. It found that Dr. Young lacked basic knowledge about the early diagnosis of hypoxia, the ability to read and compare the necessary imaging of M.'s injuries, and the ability to differentiate between acute and chronic brain bleeds.

The district court found that Dr. Young was qualified as a pathologist and was a forensic scientist with extensive experience. But the record confirms that Dr. Young lacked experience in pediatrics, obstetrics, or gynecology—medical areas that would help form an informed opinion on hypoxia during birth. Dr. Young admitted that he had delivered only "two or three" babies, none of which involved emergency complications, as there were here. The district court also found that Dr. Young did not understand and was not an expert in magnetic resonance imaging (MRI) and he did not understand the difference between CTs and MRIs. Dr. Young admitted that he had not looked at any of the MRIs, and that he did not know whether MRIs are better at detecting acute versus chronic hemorrhaging. This lack of knowledge regarding imaging is significant given M.'s injuries and Dr. Young's reliance on the supposition that M. suffered from chronic dural hemorrhaging.

At the hearing on Mother's motion to reconsider its *Daubert* ruling, the district court clarified that although Dr. Young may qualify as an expert on other topics, he did not qualify here:

> "[Dr. Young] is a qualified forensic pathologist. He does have 18 years of history conducting autopsies and being a medical examiner, until 1996. However, he is not, and doesn't claim to be, qualified in the area of pediatrics, or obstetrics, or gynecology. So his testimony was based upon his experience as a pathologist or a forensic examiner. And in giving that testimony, he did not, through his testimony, inform this Court on how that expertise would allow him to be knowledgeable in the area of prenatal and postnatal trauma and subsequent trauma to a live baby two months later, after the initial birth. Much of his entire theory is based upon the premise that arose from prenatal and postnatal injury, where he says that late decelerations in utero resulted in hypoxia."

We find no error in that conclusion. See *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (stating "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue"); *City of Topeka v. Lauck*, No. 116,316, 2017 WL 4216191, at *4 (Kan. App. 2017) (unpublished opinion) (concluding that a pathology assistant's work in forensic pathology did not qualify him to testify that a defendant's asthma artificially inflated the results of a breathalyzer test, an assessment which required specialized expertise); *Delgado v. Unruh*, No. 14-CV-01262-JAR, 2017 WL 957437, at *19 (D. Kan. 2017) (unpublished opinion) (finding that a chiropractor with no training in biomechanics or kinematic studies is not qualified to testify about the forces involved in a crash or the type of bodily injuries that would or would not result based on the mechanical forces generated).

The district court also emphasized that Dr. Young could not discuss information in a way that would help the jury's consideration. For example, Dr. Young could not testify about any symptoms M. might have had at birth or test results that could have shown that M. had sustained hypoxia at birth. Instead, Dr. Young simply intended to testify that it

33

would be almost impossible to tell whether M. suffered from hypoxia because at birth M.'s brain function was too primitive. The district court found that this testimony directly contradicted the physical examinations and tests that are routinely administered to determine a newborn's neurological functioning.

The district court properly considered Dr. Young's experience and expertise and found it inapplicable to this case. Mother fails to show that the district court abused its discretion in excluding his opinion.

*Cumulative error*

Mother's third issue contends that cumulative error deprived her of a fair trial. Because we are remanding for a new trial, we do not reach that issue.

Reversed and remanded for a new trial.